### [No. 2663.]

### SYLVESTER BENEVIDES *v.* THE STATE.

1. CHARGE OF THE COURT—PRACTICE.—It is the duty of the trial court, in felony cases, to instruct the jury upon the law of the entire case, whether asked or not.
2. SAME—MURDER—EVIDENCE.—When, in a murder trial, the evidence is such as to denote murder of the first degree, or that the killing was upon express malice, or that it was done in the perpetration, or in the attempt to perpetrate, certain offenses named in Article 606 of the Penal Code, the trial judge should confine the charge to the case so made by the evidence, omitting instructions applicable to all lower grades.
3. SAME.—The correct rule is, that, to relieve the trial judge of the duty of charging upon lower degrees of culpable homicide, the evidence must establish the highest degree; for if there be reasonable doubt it must be solved by the jury, and not by the court. This rule applies to all cases in which the greater includes the lower degree of culpability.
4. SAME—REASONABLE DOUBT.—When, in order to establish murder of the first degree, the prosecution is forced to rely upon proof of express malice, or that the killing was done in the perpetration or attempted perpetra-

tion of robbery, the proof must establish one of these grounds so conclu-sively as to place the existence of the one or the other beyond a reason-able doubt.

5. SAME.—BURDEN OF PROOF is upon the State to prove, not only that the accused killed the deceased, but, when a conviction for murder of the first degree is sought, to prove that the killing was upon express malice, or in the perpetration or attempted perpetration of some one or more of the offenses specifically named in the said article of the Code.

6. SAME—CHARGE OF THE COURT—PRACTICE.—When a killing is not shown to have been done with express malice, or under such circumstances as would render the homicide murder of the first degree, it is incumbent upon the court to charge upon the lower degree or degrees indicated by the evidence.

-7. SAME.—See the opinion *in extenso* or an exposition of the views of this court upon the subject of charging the jury in murder cases.

8. SAME—EVIDENCE.—Note also a state of case wherein the court should have instructed the jury upon the law of murder in the second degree.

APPEAL from the District Court of McMullen.  Tried below before the Hon. D. P. Marr.

The indictment charged the appellant with the murder of Pedro Garcia, in McMullen county, Texas, on the thirteenth day of July, 1882.  The conviction was for murder in the first degree, and the punishment awarded was a life term in the penitentiary.

Hamp. Kuykendall was the first witness for the State.  He tes-tified that on or about August 15, 1882, he found a wallet in the mesquite brush, about two and a half miles northwest from Til-den, in McMullen county, Texas.  The wallet was spread out upon the ground, and was covered with a piece of brown paper, upon which lay a piece of sun-wilted cheese.  It was evident to the witness that some party, or parties, had stopped there to eat.  This was on the McKinnon ranch, in a chapparel thicket, about three-quarters of a mile from a road leading from Tilden to Kuydendall's ranch.  About fifteen feet distant from the wallet, paper and cheese, the witness found a bullet hole in a mesquite bush, which indicated that the ball was fired from a slanting direction with a downward range.  In the wallet the witness found a leather-back memorandum book, which he here identifies, containing a note written in Spanish and a pencil memorandum for merchandise, which two papers the witness also here identifies.  Some fifty steps distant from where the witness found the wallet, he found a black "slicker," which he here identifies.

On or about September 26, 1882, the witness found a human

skeleton, about one hundred and fifty yards from where, on August 15, 1882, he found the wallet, paper and cheese. Near the skeleton, he found a light colored hat with a powder burned bullet hole near the band, a butcher knife, a pair of shoes containing the bones of the feet, and to which was attached a pair of unmatched spurs, and a pair of ducking pants with blood on the legs. These various articles were here exhibited to t he witness and identified by him. A forty-four or forty-five calibre ball had entered the back of the head and gone out between the eyes. The articles described were so scattered as to indicate that the deceased had run in a zig-zag course from the wallet to the place where he was shot, or, rather, to the place where the skeleton was found. On finding the skeleton, the witness went to Tilden, reported, and returned with the jury of inquest. The deceased had been dead, the witness judged from appearances, about three months when the skeleton was found. The skeleton was almost entirely fleshless.

Andrew McKinnon testified, for the State, that he knew Pedro Garcia before his death, and for three months prior to that event he had the said Pedro in his employ on his sheep ranch. On the twelfth day of July, 1882, he sent Pedro Garcia to Tilden, McMullen county, to employ a shepherd. Pedro rode a noted horse belonging to the witness, and wore a white colored hat. The hat found by Kuyken lall near the skeleton was her e exhibited to the witness, and was identified by him as the hat worn by Garcia on the trip to Tilden. The witness knew the hat well, and identified it by the brand "D. and A. Oppenheimer," and by stains of sheep wash, which he exhibited to the jury.

The witness gave the deceased a thirty-dollar check on San Antonio, the day the latter started to Tilden. The deceased was to return to the witness's ranche, on the boundary between Mc-Mullen and Atascosa counties, on the day after he started to Tilden. He did not return as expected and arranged, and the witness went to Tilden himself on the next day to find out the cause of delay. He learned in Tilden that the check was cashed at Jordan's store, and that the deceased, Pedro Garcia, started back to the witness's ranche. The witness never saw Garcia after he started to Tilden, on July 12. The witness recovered his horse afterwards, in the country where he was taken up, but has not since seen the bridle and saddle. The witness made out the memorandum here exhibited, which calls for one

pair number ten and one pair number six shoes, and two boxes of forty-four calibre cartridges. Witness had known Pedro Garcia as a shepherd before he employed him.

F. H. Cromwell testified, for the State, that he found the horse described by the witness McKinnon among his, witness's, gentle horses, on July 16, 1883. This was about one mile southeast of Tilden. There was no bridle or saddle on the horse.

John Young testified, for the State, that he was· one of the jury of inquest which went to view the remains of the dead man found in the chapparel some two and a half or three miles north-west of Tilden. He identified the hat exhibited as the hat which was found near the body. The brand of "D. and A. Oppen-heimer," was stamped on the lining, as seen then and as seen now. The bullet hole was in it when found and is there now. A bullet entered the head of the deceased from behind and emerged near an eye, as indicated by the skull of the skeleton. A bullet hole was found in a mesquite bush near where the· wallet was said to have been found. A pair of pantaloons, bloody inside, encased the legs of the skeleton. Watermelon seeds lay around the place, and some were found in that part of· the skeleton which had been the stomach.

Benito Rodriguez testified, for the State, that he knew Pedro Garcia in his life time, and that he and Garcia worked for Mr. Andrew McKinnon. McKinnon dispatched Garcia to Tilden on July 12, 1882, to employ shepherds, and the witness was placed in charge of the herd of sheep over which Garcia had control, until the latter should return. When Garcia started to Tilden the witness got Mr. McKinnon to make out for him a memoran-dum for a pair of number ten shoes, a pair of number six ⟨h⟩es, and two boxes of forty-four calibre cartridges. The witness here identified that order as the one in evidence, and also the hat offered in evidence as the hat which belonged to and was. worn by Garcia. The shoes he also identified as Garcia's. Be-fore or just as Garcia started to Tilden, the witness loaned him a knife, a pair of unmated spurs and a slicker. The witness. first described certain peculiarities of these articles, and was then shown the knife, spurs and slicker found near the skeleton, and identified them by those peculiarities as those he loaned Pedro Garcia on the morning the latter started to Tilden. The· witness also loaned Garcia a six shooter, which he, Garcia, wore· when he started to Tilden, and the witness has not seen it since.

R. Jordan testified, for the State, that he knew Pedro Garcia

before his death. Garcia came to the witness's store in Tilden, McMullen county, on the twelfth or thirteenth of July, 1882, and said that he came to town to employ shepherds for Mr. McKinnon. He then handed the witness a check on San Antonio for thirty dollars, which the witness cashed, partly in currency and partly in silver. The defendant, Benevides, was not present when the witness cashed this check, but the witness saw him and Pedro together at his store shortly afterwards. The witness knew the defendant before, and identified the man, Sylvester Benevides, now on trial, as the man he saw talking with Garcia in his store at the time mentioned. Witness did not see defendant and Garcia leave town.

Roque Elisondo testified, for the State, that he gave Pedro Garcia a paper, written in Spanish for him by Francisco Bella, on the thirteenth day of July, 1882, in Tilden, McMullen county, Texas. The paper was an order to collect for the witness the sum of six dollars, which was due him by one of the shepherds on McKinnon's ranche. The witness gave Garcia this order at Bella's house, just as the latter was ready to start back to McKinnon's ranche. The defendant was at Bella's house with Garcia, and started off with him in a northwesterly direction. Witness saw them traveling together for about fifty yards, and noticed them no further. Garcia left on horseback, and the defendant on foot, walking by the side of the horse. Antonio and Francisco Bella were present when the defendant and Garcia left together.

Antonio Bella testified that he kept an eating house in Tilden, McMullen county, Texas. He knew the defendant, and also Pedro Garcia in his life time. Garcia and the defendant were at the witness's house on July 13, 1882, and left the house together on the afternoon of that day. Garcia was riding and the defendant walking. Garcia had a pistol on that day.

Francisco Bella testified, for the State, to the same facts stated by Antonio Bella, and, in addition stated that he wrote a note in Spanish for Roque Elisondo authorizing Garcia to collect six dollars from a shepherd at McKinnon's ranch. He recognized the paper in evidence as the one he wrote.

John Kaltener testified, for the State, that Garcia came to his house in July, 1882, and paid him three dollars and a half for making him some clothes. He, Garcia, had two ten dollar bills in a small leather memorandum book similar to that in evidence. He had in all about twenty-four dollars when he left the wit-

ness's house.  The witness saw Garcia and the defendant to-gether that evening at Bella's eating house.  They were then on the eve of leaving town together.  Witness asked if Garcia was going to take the defendant to the ranch as a shepherd.  Both answered " no," but that defendant was going out on a short pleasure trip.  Defendant tied a bundle on the horse behind the saddle.  He had his coat and a pistol over his shoulder.  The two left town together, going in a northwest direction.  The witness saw them together until they got into the chapparel on the edge of town.  This was on the evening of July 13, 1883.

R. C. Holland testified, for the State, that he lived in McMullen county, about three quarters of a mile northwest from Tilden, near where the San Antonio and Kuykendall ranch road forks.  He saw the defendant and the deceased about three-quarters of an hour before sunset on the evening of July 13, 1883.  They passed his house, both riding the McKinnon bay horse, the deceased in front and the defendant behind.  The defendant was very well dressed, and had a pistol buckled around him.  The deceased had on a light colored hat like that in evidence, and a pair of ducking pants.  If he had a pistol witness did not see it.  When they reached the fork of the road they took the branch leading to Kuykendall's ranch.  The witness was one of the jury of inquest.  He saw the ducking pants which were found on the skeleton.  They were bloody inside.  The skeleton had a bullet hole through the skull, from behind through to the front.  Witness knew the McKinnon horse well.  Shortly after the day on which these parties passed his house, the witness saw McKinnon's horse at a water hole about one mile from where the body was found.  The body was found between two and three miles from where the witness saw these two men on the McKinnon horse.  The defendant was then and is now a one armed man.

L. A. Scoggin, deputy sheriff and jailor, testified that the hat, slicker, shoes, spurs, memorandum book, etc., in evidence, were turned over to him by the present sheriff, and were in the same condition as when he received them.

Sheriff Martin testified that he received the articles from Mr. Morgan, the deputy of his predecessor in office, and immediately turned them over to Scoggin.

John Morgan testified that he delivered the articles in evidence to Mr. Martin, sheriff elect, just as he received them from the coroner's jury.  He, witness, arrested the defendant at Hall's

ranch in LaSalle county, on a *capias* charging him with the murder of Pedro Garcia.

Frank Hall testified, for the defense, that for the two years he had known the defendant the latter had borne a "generally good character." He left the employ of the witness to work for L. M. Campbell on May 25, 1882, and returned to work for witness on December 25, 1882. When he left witness in May, witness gave him fifty dollars with which to pay an amount he said he owed Campbell. He afterward brought that money back to the witness, saying that Campbell did not want it, but wanted him to work out his debt. He promised witness to return to his employ when he had worked out that debt. This he did on September 25, 1882, and remained with the witness until his arrest, on October 5, 1882.

J. M. Campbell testified, for the State, that the defendant had worked for him at different times since 1877. He last worked for witness in July, 1882. Witness settled with him on the twelfth day of July, 1882, paying him forty-one dollars and five cents; since which time he has not worked for the witness. Speaking of his character, the witness said: "The Mexicans call him lightning."

R. S. Ray testified, for the State, that the reputation of the defendant as a citizen was very bad. He was considered reckless, and "ready to make desperado plays with his six shooter, drawing readily and for trivial things. He is considered a dangerous man."

The motion for new trial assailed the verdict as unsupported by law or evidence, and denounced as error the failure of the court to charge upon murder in the second degree.

*O.* and *T. S. Archer*, for the appellant: The law is well settled in this State by repeated decisions, that when the fact of unlawful killing is proved, and no evidence tends to show express malice on the one hand, or any justification, excuse or mitigation on the other, the law implies malice, and the offense is murder in the second degree. (*Hill* v. *The State*, 11 Texas Ct. App., 469; *Harris* v. *The State*, 8 Texas Ct. App., 109; *Douglass* v. *The State*, 8 Texas Ct. App., 529; *Hubby* v. *The State*, 8 Texas Ct. App., 607.)

It is also equally well settled in this State that if there should be any doubt, under the facts as proven at the trial of the case, whether the offense is murder in the first or second degree, it

matters not how slight the doubt may be, it is the duty of the court to charge upon murder in the second degree, in order that the jury may pass upon that doubt. (*Edmondson* v. *The State,* 41 Texas, 498 and 499; *Halbert* v. *The State,* 3 Texas Ct. App., 661; *Hill* v. *The State,* 5 Texas Ct. App., 8.)

So humane is the law in its provisions that it is said in the above case of *Hubby* v. *The State,* that generally in all prosecutions for murder it is the safer practice to instruct the jury as to both degrees of murder.

This charge upon murder in the second degree should have been given whether asked in the court below or not; for in all felony cases the court must charge the jury, whether asked or not, upon every legitimate issue arising upon the facts. (*Bennett* v. *The State,* 12 Texas Ct. App., 23.)

*J. H. Burts,* Assistant Attorney General, for the State.

HURT, JUDGE.    This is a conviction of murder of the first degree, the punishment being assessed at confinement in the penitentiary for life.

The trial judge failed to submit to the jury a charge upon the law governing in cases of murder upon implied malice and murder of the second degree.    Defendant moved for a new trial, and in his motion this is expressly made one of the grounds.    It being the duty of the trial judge, in felony cases, to charge the law applicable to the case, whether asked or not, the question here presented is, does the case—that which is made by the evidence, the whole evidence—require a charge upon murder of the second degree?    If the case is such, or, what is the same thing, if the evidence is of that character as to place it alone within the sphere of murder in the first degree, and that the killing was upon express malice, or done in the perpetration, or the attempt at the perpetration, of certain offenses named in Article 606 of the Penal Code, the trial judge should confine the charge to such a *case,* so made by the evidence, omitting instructions applicable to all lower grades.

From the above proposition it follows that the correct rule is this: To relieve the trial judge of the duty of charging upon lower degrees of culpable homicide, the evidence (the case) must establish the highest degree.    For, if there be reasonable doubt, the court cannot solve the doubt; this must be done by the jury. We believe this rule to be correct, whether applied to cases of

Y

homicide or to all cases in which the greater includes lesser degrees of culpability.

To establish murder of the first degree under the evidence in this case, the State relied, and was forced by the case to rely, upon proof of express malice, or that the killing was done in the perpetration or attempted perpetration of robbery. Hence the State must prove one or the other of these grounds so conclusively as to place the existence of one or the other beyond a reasonable doubt. The burden is upon the State, not only to prove that defendant killed deceased, but, where she demands a conviction and punishment for murder of the first degree, to prove that the killing was with express malice or in the perpetration, etc., of some of the offenses specifically mentioned in the Code.

When the trial judge comes to submit his instructions to the jury, he should carefully look to all of the evidence, analyze and weigh the same, and if the killing is not shown to have been with express malice, or under the circumstances which would make the homicide murder of the first degree, he should charge upon the lower degree or degrees, as indicated by the evidence. To justify an omission to instruct upon lower degrees, he should be able readily, without pressing or straining facts, to grasp the facts or circumstances which place the case alone within the sphere or boundary lines of the highest degree. No presumption from facts or a combination of facts can be indulged, unless they lead to the conclusion sought, and to no other. For if such cogency is wanting, the jury might doubt; or if the evidence or any part thereof lead to other conclusions, uncertainty appearing, the jury might take that which is not so unfavorable to defendant, or might have a reasonable doubt as to which is the correct conclusion.

Looking, then, to the record in this case, can we point to a fact or a combination of facts or circumstances which lead to the conclusion that the defendant is guilty of murder of the first degree? Does this appear so evidently and conclusively as to justify the court below in withholding this matter from the consideration of the jury? We think not.

In order that there may be no misunderstanding of our views upon this subject, we will illustrate.

1. Suppose the case is one in which murder of the first degree is clearly and conclusively established *in the opinion of the trial judge,* but there is evidence tending to rebut this conclusion or

to establish murder of the second degree.    Should the judge submit a charge upon the lower degree?    Unquestionably he should.    Why?    Because it is the province of the jury, and not that of the court, to pass upon the credibility of the witnesses and the weight of the evidence.    2. Suppose that the evidence is of that character as to leave no doubt that the homicide was of the first degree, and there is no evidence tending to reduce the offense.    Must the trial judge submit a charge upon the lower degree?    We think not.

Hence, if there be a want of evidence to prove the first degree, or if the evidence be doubtful or conflicting, though deemed conclusive by the trial judge to establish the first degree, nevertheless instructions must be given upon the lower degree; and these rules apply to all degrees from the highest to the lowest embraced in the charge.    These rules are to govern the court, and by them the judge is to determine the necessity of submitting charges upon the different degrees, or the different offenses contained in the charge preferred by the bill of indictment.

They are not rules for the guidance of the jury trying the case. The jury will not, *because instructed* upon the higher or lower degree, infer that the presiding judge believes the one or the other way in regard to the evidence.    Their duty is quite distinct from that of the judge.    Theirs it is to determine the guilt and the degree of the guilt of the defendant, from the law as given them by the court and the evidence adduced upon the trial.    They can judge of the credibility of the witnesses and the weight to be given to the evidence.    This can not be done by the trial judge.    It is his duty to submit the law applicable to every phase of the case presented by the evidence, viewed as a whole or in its parts.

We will not discuss the evidence, believing that more light can be had upon another trial.    (The Reporters, however, will give a statement of the facts.)

Because the court failed to charge the law applicable to murder of the second degree, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered June 8, 1883.